## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| | : |
| In re: | : Chapter 7 |
| | : |
| TENGION, INC., | : Case No. 14-12829 (CSS) |
| | : |
| Debtor. | : **Hearing Date: TBD** |
| | : **Obj. Deadline: TBD** |

**EMERGENCY MOTION OF THE CHAPTER 7 TRUSTEE FOR
(I) AN ORDER (A) APPROVING THE PRIVATE SALE AGREEMENT
WITH REGENMEDTX, LLC, (B) APPROVING THE BREAK-UP
FEE AND EXPENSE REIMBURSEMENT RELATING TO THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) APPROVING THE
CURE PROCURES AND THE FORM AND MANNER OF NOTICE THEREOF, AND
(D) SETTING SALE HEARING DATE, AND (II) AN ORDER (A) APPROVING THE
SALE OF THE DEBTOR'S ASSETS TO REGENMEDTX, LLC, FREE AND CLEAR OF
LIENS, CLAIMS, AND ENCUMBRANCES, AND (B) GRANTING RELATED RELIEF**

Charles A. Stanziale, Jr., in his capacity as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the bankruptcy estate of Tengion, Inc., (the "Debtor"), by and through his undersigned attorneys, hereby moves (the "Motion") the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), pursuant to sections 105(a) 363 and 365 of Title 11 of the United States Code, §§ 101-1532 (as amended, the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of (i) an order (the "Procedures Order") attached hereto as **Exhibit A** (a) approving the terms of the private sale agreement by and between the Chapter 7 Trustee and RegenMedTX, LLC (the "Buyer"), dated February 12, 2015 (the "Private Sale Agreement" attached hereto as **Exhibit B**) (b) approving the break-up fee and expense reimbursement relating to the private sale (the "Sale") of substantially all of the Debtor's assets (the "Assets") to the Buyer (c) approving the cure procedures and the form and manner of notice thereof, and (d) setting a sale hearing date no later than February 24, 2015, and (ii) an order (the "Sale

Order") attached hereto as **Exhibit C** (a) approving the sale of the Debtor's Assets to the Buyer, and (b) granting related relief.  In support of this Motion, the Chapter 7 Trustee respectfully represents as follows:

## I.        Jurisdiction, Venue and Predicates for Relief

1.        The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of this Motion and the Bankruptcy Cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are sections 105(a) and 363(b), (f), (k) and (m) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the applicable Local Rules of the Bankruptcy Court.

## II.        Background

### A.        The Debtor and the Bankruptcy Case

2.        On December 29, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

3.        On December 30, 2014, the Office of the United States Trustee for the District of Delaware appointed Charles A. Stanziale, Jr. as the Interim Chapter 7 Trustee in the Debtor's bankruptcy case.

4.        Founded in 2003, the Debtor was formerly a leader in the field of regenerative medicine, focusing its resources on discovering, developing, and testing products and procedures using a patient's own regenerative cells to repair or replace diseased or damaged organs and tissues. The Debtor is known primarily for its research and product development relating to kidney disease and bladder cancer.

5.      Prior to the Petition Date, the Debtor had two major clinical programs underway: one for the discovery and development of a product intended to prevent or delay dialysis and transplantation; the other pertaining to bladder cancer patients and the development of an implant to catalyze regeneration of native-like urinary tissue.  The clinical trials associated with these programs have apparently demonstrated promising results.

6.      The Debtor's former Chief Financial Officer, A. Brian Davis ("CFO") has advised the Chapter 7 Trustee that, prior to the Petition Date, the Debtor took the necessary steps, and made the necessary payments, to preserve and maintain the status quo of these clinical programs and other related biological samples or clinical research through December 2015.[1]

7.      The Debtor also holds certain intellectual property, which includes an extensive patent portfolio.  Finally, the Debtor owns various laboratory equipment and machinery utilized in the ordinary course of its business.

8.      Since his appointment, among other things, the Chapter 7 Trustee has secured and maintained the Assets.  The Chapter 7 Trustee and his proposed counsel have held numerous discussions with the CFO, the Debtor's pre-petition lenders and/or investors, the Debtor's former investment banker, and various business advisory firms, liquidators, potential turn-key purchasers, and other interested parties to determine the optimal manner in which to maximize value for creditors.

**B.      The Debtor's Debt Structure**

9.      The Debtor issued senior secured convertible notes in the amount of $15,005,251 on October 2, 2012, and senior secured convertible notes in the amount of $18,576,000 on June

---

[1] For example, certain biological samples are required to be frozen and preserved under sterile laboratorial conditions.  The Debtor's former CFO has advised that the payments have been made to keep this service in place through December 2015.

28, 2013 (together, the "Notes").  These Notes were outstanding at the time of the Petition Date and are asserted to be secured by an allegedly perfected lien on the Assets of the Debtor (the "Secured Claims").  The holders of these Notes are listed on the Debtor's schedules.

10.    Deerfield Special Situations Fund L.P., RA Capital Healthcare Funds LP and Celgene Corporation will assign their Secured Claims, inclusive of principal and interest, in the approximate amount of $20,561,152.20 to the Buyer (the "Assigned Secured Claims") in exchange for an aggregate of 25% of the limited liability company membership interests in the Buyer.  In the event that the Private Sale Agreement is approved by the Court, the Assigned Secured Claims will either be waived or bid-in entirely.

### C.    Marketing Efforts

11.    Prior to the Petition date, the Debtor retained the nationally recognized investment banker, Jefferies LLC ("Jefferies"), as well as a nationally recognized law firm, in an effort to seek a turn-key buyer for the Assets.  Initially those efforts included pursuing an orderly sale through a chapter 11 process.  Ultimately, liquidity concerns and other factors prevented such efforts from being feasible.  The Debtor then voluntarily commenced a chapter 7 proceeding. The Chapter 7 Trustee has personally conferred with Jefferies with regard to their extensive pre-petition marketing efforts, their opinion as to current interest in the Assets and reviewed the list of potential purchasers with whom Jefferies discussed a potential sale transaction.

12.    Immediately upon the Chapter 7 Trustee's appointment, he aggressively solicited turn-key offers from various parties in an effort to consummate a turn-key transaction rather than a piece-meal liquidation of the Assets.

13.    In addition, the Chapter 7 Trustee conferred with a majority of the Debtor's secured lenders with regard to a possible credit bid transaction and/or a liquidation of the Assets.

14.     Finally, prior to making the business decision to enter into the Private Sale Agreement, the Chapter 7 Trustee conferred with a nationally recognized patent broker and liquidator with regard to the costs and potential recoveries in a liquidation process versus a turn-key sale and has made the business decision that the Private Sale Agreement is superior to a piece-meal liquidation of the Assets.

### D.     The Debtor's Operating Facilities and Laboratory

15.     The Debtor's corporate headquarters, research and development laboratories, and manufacturing facility are located in Winston-Salem, North Carolina (the "North Carolina Facility").   On or about June 8, 2005, the Debtor and Fawn Industrial, LLC entered into a certain non-residential lease (the "North Carolina Lease") for the North Carolina Facility.   The North Carolina Lease was not terminated prior to the Petition Date, and is therefore an "unexpired lease" under section 365 of the Bankruptcy Code.   Under the North Carolina Lease, the Debtor pays a monthly rent of $14,584.00, plus other necessary utility and maintenance expenses (the "North Carolina Carry Costs")[2].   The majority of the Debtor's machinery, equipment, and supplies used in business are located at the North Carolina Facility.

16.     The nature of the North Carolina Facility and the Debtor's business requires the Debtor to have monitoring and oversight responsibilities at the North Carolina Facility.   Since the Petition Date, three former employees of the Debtor have been willing to rotate daily monitoring services of the North Carolina Facility (including responding to alarms).   In his

---

[2] To the best of the Chapter 7 Trustee's knowledge, the estimated monthly North Carolina Carry Costs include monthly payments to Duke Energy in the estimated amount of $18,000, Piedmont Natural Gas in the estimated amount of $5,000, City of Winston-Salem in the estimated amount of $450 for water and sewer charges, AT&T for phone and security system services in the estimated amount of $450, to a waste disposal company in the estimated amount of $1,000, Time Warner for the building monitor system in the estimated amount of $1,250, Convergent for network services in the estimated amount of $2,750, and facility maintenance personal in the estimated amount of $11,820.  The Chapter 7 Trustee, and not the Buyer, shall satisfy the actual North Carolina Carry Costs from the Petition Date through February 28, 2015.

business judgment, the Chapter 7 Trustee determined that maintaining the North Carolina Facility and the retention of three former employees of the Debtor to monitor the North Carolina Facility for a limited period of time was necessary while he actively solicited a turn-key purchaser and shall remain necessary through Closing.

**E.    The Terms of Private Sale Agreement/Disclosures Pursuant to Local Rule 6004-1(b)(iv)**[3, 4]

17.    A summary of the terms of the Private Sale Agreement includes the following:

- **Purchase Price**: the aggregate purchase price (the "Purchase Price") to be paid by the Buyer for the Assets is $1.5 million dollars (1,500,000.00) at Closing plus a credit bid in full of the Assigned Secured Claims in the approximate amount of $20,561,152.20.

- **Good Faith Deposit**: the Buyer has agreed to immediately provide a deposit in the amount of $150,000.00 to the Chapter 7 Trustee, which shall only be refundable in the event that (i) the Motion is not granted by February 24, 2015, (ii) the Motion and the Sale Order are granted, however the transaction does not timely close by February 27, 2015 through no fault of the Buyer, or (iii) the Motion is granted but a sale order is entered with an alternate buyer.

- **Carve-Out for Unsecured Creditors:** the Buyer has agreed that five percent (5%) of the cash purchase price shall be utilized by the Chapter 7 Trustee for the benefit of general unsecured creditors, that at Closing the Assigned Secured Claims shall be deemed credit bid in full and that the Chapter 7 Trustee's retained professionals, subject to a fee application, shall be entitled to reimbursement from the proceeds of the sale received by the estate of costs and fees through Closing from the estate.

- **The Assets to be Sold**: the Assets to be sold are specifically set forth in the Private Sale Agreement and include but are not limited to the following:

  - All the Debtor's title to and/or interest in any materials (including, without limitation, manufacturing raw materials, components, and support materials),

---

[3] The summary contained herein is qualified in its entirety by reference to provisions of the Private Sale Agreement. In the event of any inconsistencies between the provisions of the Private Sale Agreement and the terms herein, the terms of the Private Sale Agreement shall govern.  Unless otherwise defined in the summary contained in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Private Sale Agreement.

[4] Any requirements of Local Rule 6004-1(b)(iv) not addressed herein have been determined not to be applicable to the Sale.

equipment, insurance policies (other than those insurance policies that constitute and Excluded Asset), intellectual property (i.e. patents, trademarks, copyrights and licenses), annuity and other payments in connection with the license of intellectual property, utility equipment including air handlers, chillers, air compressors, boilers, vacuum system, backup generator, and carbon dioxide and liquid nitrogen supply tanks.

- All of the Debtor's title to and/or interest in any computer systems including servers for LAN, Internet, e-mail, data storage, BMS/BAS and phone systems.[5]

- All of the Debtor's title to and/or interest in any manufacturing equipment and supplies including Biological Safety Cabinets, incubators, refrigerators, freezers, centrifuges and autoclaves, analytical equipment including flow cytometers, plate readers and washers, biochemistry analyzers.

- Any of the Debtor's documents relating to the following including manufacturing records, intellectual property records, financial documents, books and records, regulatory documents, clinical site agreements, records regarding manufacturing raw materials, components and support materials.

- All of the Debtor's title to and/or interest in any and all biological samples located at the North Carolina Facility and/or Gentris (another location in North Carolina), including (without limitation) those related to the NeoKidney Augment or NeoUrinary Conduit programs.  All of the Debtor's title to and/or interest in any biological (preclinical, clinical and standard) samples located at clinical sites (e.g. the University of North Carolina in Chapel Hill, Karolinska Hospital in Stockholm, Sweden, etc.), including (without limitation) those related to the Neo Kidney Augment or NeoUrinary Conduit programs.

- **The Excluded Assets:** the Sale of the Assets specifically shall not include (i) any chapter 5 causes of action or other litigation claims of any kind possessed by the Chapter 7 Trustee other than as specifically included in the Private Sale Agreement, (ii) any cash and accounts receivable of the Debtor, (iii) any D&O or E&O insurance policies claims, recoveries or proceeds other than as against Tim Bertram, Deepak Jain, or other current or future officers, directors, employees, or members of the Buyer, (iv) any and all monies due to the Debtor, including but not limited to the security and restoration deposits from a non-residential lease

---

[5] The Buyer shall allow the Chapter 7 Trustee's retained professionals reasonable access to forensically copy any computer or servers which contain books, records or other documents that the Chapter 7 Trustee deems necessary to administer the bankruptcy proceeding.  In addition, the Buyer shall provide the Chapter 7 Trustee access to any hard documents which he may require to administer the bankruptcy proceeding.  To the extent the Chapter 7 receives a demand for documents or a subpoena which relates to Tim Bertram or Deepak Jain, the Chapter 7 Trustee shall immediately notify counsel for the Buyer and shall not turn over any documents relating to Tim Bertram and Deepak Jain unless ordered by the Court or other governmental agency.

agreement with Norriton Business Campus, L.P., and (v) any monies due to the Debtor from a certain sublease with Corporate Interiors, Inc.

- **The North Carolina Lease**: the Chapter 7 Trustee shall assume and assign the North Carolina Lease and any right, title, or interest in and to the associated security deposit to the Buyer.  The Chapter 7 Trustee shall be responsible for and pay the North Carolina Carry Costs due through and including February 28, 2015.  In the event the Sale Order is not entered by March 1, 2015 and the Buyer has not elected or does not elect to terminate the Private Sale Agreement, the Buyer shall thereafter be responsible for the North Carolina Carry Costs.  In the event the Motion is either (i) denied or (ii) granted and the Chapter 7 Trustee closes with an alternate purchaser, the Buyer shall be entitled to the reimbursement of any of the North Carolina Carry Costs it has paid as part of its expense reimbursement.

- **The Gentris Lease**: at the Closing, the Chapter 7 Trustee shall assume and assign the Gentris Lease to the Buyer.

- **Executory Contracts**: the Buyer shall provide the Chapter 7 Trustee with a list of any executory contracts and/or leases it desires to be assumed and assigned at least fifteen (15) days prior to Sale Hearing.  The Chapter 7 Trustee shall provide any counterparty to an executory contract or unexpired lease requested to be assumed and assigned to the Buyer (the "Assumed Contracts") a cure notice (the "Cure Notice").  The Buyer shall be responsible for the payment of any and all Cure costs at Closing (other than the North Carolina Carry Costs due through and including February 28, 2015, which shall be paid by the Chapter 7 Trustee) and shall have the right to independently negotiate, or litigate the cure amounts.  Upon receipt of the list of executory contracts and leases that the Buyer wishes to assume, the Chapter 7 Trustee will immediately serve a Cure Notice upon each counterparty to the potential Assumed Contracts.  The Cure Notice shall identify the amounts, if any, that the Chapter 7 Trustee believes is owed to each counterparty to a potential Assumed Contract in order to cure any defaults.  The Cure Notice shall also (i) state the applicable date, time and place of the Sale Hearing, (ii) provide the deadline by which any objection to the assumption and assignment of the applicable Assumed Contracts must be filed with the Court, (iii) provide that, in the event that any such objection is filed by such deadline, then such objection shall be presented at the Sale Hearing, and (iv) provide that, in the event that no such objection is filed by such deadline, then such Cure Amount shall be binding on the applicable counterparty.  If an Assumed Contract is assumed and assigned under the proposed Sale, then unless a counterparty timely files and prosecutes a cure objection pursuant to the Cure Notice (or reaches a negotiated resolution with the Buyer), the counterparty will receive payment from the Buyer of the Cure amount, if any, as set forth in the assumed contract schedule (the "Assumed Contract Schedule") (unless removed from such schedule by the Buyer prior to Closing, pursuant to the terms below).  Prior to the commencement of the Sale Hearing, the Chapter 7 Trustee shall file the Assumed Contract Schedule provided by the Buyer.  At the Sale Hearing, the Chapter 7 Trustee shall seek authority to assume and assign the Assumed Contracts to the

Buyer effective as of the Closing of the Sale; provided, however, that the Buyer in its sole discretion may require the Chapter 7 Trustee to remove any Assumed Contract from the Assumed Contract Schedule at any time up to the Closing of the Sale.  The Counterparty to any deleted Assumed Contract will be notified of such deletion by written notice via U.S. first-class mail by no later than two (2) business days from such determination.

- **The Assets Will be Sold Free and Clear of Encumbrances, and the Buyer Shall Not Have Successor Liability**: the Sale of the Assets by the Chapter 7 Trustee to the Buyer shall be free and clear of all liens, claims, security interests, pledges, charges, options, encumbrances and interests of any kind whatsoever (collectively, the "Encumbrances") thereon and therein against in accordance with section 363 of the Bankruptcy Code.  The Chapter 7 Trustee requests that the order approving the Sale provide that the Buyer shall not have any liability as successor of the Debtor, whether in law or in equity, including (without limitation) based on any theory of transferee, successor, and/or vicarious liability of any kind or nature under any law, statute, rule, or regulation.

- **"AS IS" WHERE IS"**: the Sale of the Assets shall be on "AS IS" "WHERE IS" basis, without representations or warranties of any kind, nature or description by the Chapter 7 Trustee, his agents or representatives.  The Buyer acknowledges it is relying solely on its own review and upon its own independent investigation of the Assets; and that it is not relying upon any written or oral statements, documents, representations, warranties of the Chapter 7 Trustee, the Chapter 7 Trustee's representatives or his retained professionals.

- **Buyer's Release**: effective upon the Closing, the Chapter 7 Trustee shall be deemed to have released the Buyer, its members, and its current officers, directors, employees, and members from any and all claims or causes of action (including, without limitation, under chapter 5 of the Bankruptcy Code), other than for the breach of a Private Sale Agreement (the "Buyer's Release").  In addition, the Chapter 7 Trustee shall not pursue claims against certain other critical vendors of the Buyer, as specified in the Private Sale Agreement if litigation not commenced with 120 days after entry of the Sale Order.  For the avoidance of doubt, the Buyer's Release shall include a full release which shall include a release from any non-compete and/or non-disclosure agreements with the Debtor.

- **The Chapter 7 Trustee's Release**: effective upon the Closing, the Buyer shall be deemed to have released the Chapter 7 Trustee both individually and in his capacity as the trustee and his retained professionals from any and all claims or causes of action related to or arising out of the Debtor's bankruptcy proceeding and/or Sale, other than for the breach of a breach of the Private Sale Agreement.

- **Private Sale**: the Sale of the Assets is a private sale.  However, any party wishing to present a higher and better offer may file a timely objection with a higher and better offer which must be received by the Seller no later than 48 hours prior to

the Sale Hearing and which must include proof of financial wherewithal acceptable to the Seller. The Chapter 7 Trustee shall provide notice of the private sale to any party who previous expressed an interest in the purchase of the Assets and may in his discretion advertise a notice of the private sale in a publication of his choosing. However, as noted above, the Buyer is credit bidding the Assigned Secured Claims, and additionally, the Buyer is provided with a break-up fee and expense reimbursement as set forth in the Private Sale Agreement.

- **Intellectual Property Fees and Costs**: immediately upon the filing of the Motion and through the date of Closing, the Buyer shall be responsible for monitoring the Buyer's intellectual property portfolio and for paying any fees and/or costs of any kind necessary, to prevent the termination of any intellectual property right or license, including but not limited to patents, that the Buyer seeks to purchase under the Private Sale Agreement (the "Intellectual Property Fees and Expenses"). The Buyer shall immediately inform the Chapter 7 Trustee of any of the Debtor's intellectual property portfolio for which the Buyer intends to satisfy the Intellectual Property Fees and Expenses and shall also immediately inform the Chapter 7 Trustee of any of the Debtor's intellectual property of which the Buyer is aware that has a termination deadline or maintenance fees that the Buyer does not intend to satisfy and purchase and/or assume.

- **Break-Up Fee/Expense Reimbursement**: in the event that (i) the Motion is granted, (ii) an order approving the Sale is entered with an alternate buyer and (iii) the Chapter 7 Trustee closes the transaction with an alternate buyer, then the Buyer shall be entitled to a break-up fee of $45,000 (i.e., three percent (3%) of the cash portion of the Buyer's proposed purchase price) (the "Break-Up Fee") and an expense reimbursement for its documented out-of-pocket costs (the "Expense Reimbursement"), including but not limited to any of the North Carolina Carry Costs or Intellectual Property Fees and Expenses that it incurred through the Sale Hearing. No later than seventy two hours prior to the Sale Hearing the Buyer shall certify to the Seller the amounts spend by it on the North Carolina Carry Costs and the Intellectual Property Fees and Expenses.

- **Closing Date:** the Closing date for the Sale of the Assets will occur within three (3) business days of the Court entering the Sale Order, and in any event no later than February 27, 2015 (after which the Buyer has the right to terminate the Private Sale Agreement in its sole discretion without penalty).

- **Insider and Agreement with Management**: Tim Bertram the former President of Research & Development and Chief Science Officer of the Debtor and Deepak Jain the former Chief Technology Officer of the Debtor are members of the Buyer. Additionally, Deerfield Special Situations Fund L.P., RA Capital Healthcare Funds LP and Celgene Corporation, each of which, among others, secured creditor of the Debtor, are members of the Buyer.

- **No Stays**: at the request of the Buyer, the Chapter 7 Trustee is requesting relief from the 14-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d). The Buyer believes that time is of the essence because the Assets require immediate attention and various fees need to be paid for maintenance of the intellectual property portfolio. Additionally, the Buyer has the right to terminate the Private Sale Agreement if closing fails to occur by February 27, 2015.

### III.    Summary of Relief Requested

18.    By this motion, the Chapter 7 Trustee seeks entry of (i) an order (a) approving the terms of the Private Sale Agreement by and between the Chapter 7 Trustee and the Buyer, (b) approving the Break-Up Fee and Expense Reimbursement relating to the Sale of substantially all of the Assets, (c) approving the cure procedures and the form and manner of notice thereof, and (d) scheduling a sale hearing to be held no later than February 24, 2015; and (ii) an order (a) approving the Sale of the Assets to the Buyer, and (b) granting related relief.

### IV.    Basis for Relief Requested

### A.    There is Sound Business Justification for the Chapter 7 Trustee's Entry into the Private Sale Agreement

19.    The Chapter 7 Trustee's decision to enter into the Private Sale Agreement is the culmination of good faith, arms-length negotiations with the Buyer targeted at maximizing the proceeds of the sale of the Assets and minimizing the burdens associated with maintenance of the Assets. Given the secured claims that encumber the Assets, the Chapter 7 Trustee believes that the alternative to approval of the Private Sale Agreement is the abandonment of the Assets pursuant to section 554 of the Bankruptcy Code, which would not result in any recovery for creditors of the Debtor's estate. Accordingly, the Chapter 7 Trustee believes that entering into the Private Sale Agreement, which provides a carve-out for allowed general unsecured creditors, is a valid exercise of the Chapter 7 Trustee's business judgment.

**B.      There is Sound Business Justification for the Chapter 7 Trustee's Private Sale of the Assets to the Buyer**

20.      The Chapter 7 Trustee submits that ample authority exists for the approval of the Sale of the Assets to the Buyer pursuant to the terms set forth in the Private Sale Agreement. Section 363(b) of the Bankruptcy Code permits a trustee to sell assets outside of the ordinary course of the debtor's business.  Section 363(b) of the Bankruptcy Code provides, in pertinent part,  that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Section 105(a) of the Bankruptcy Code further provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In pertinent part, Bankruptcy Rule 6004 states that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1).

21.      Courts interpreting section 363(b)(1) of the Bankruptcy Code have held that transactions should be approved when they are supported by the sound business judgment of the trustee.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the articulated business justification and good faith tests of *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require the debtor to show that a sound business purpose justifies such actions").

22.     This fundamental analysis does not change if the proposed sale is private, rather than public. *See, e.g., In re Ancor Exploration Co.*, 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)(1)"). The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), *vacated on other grounds*, 165 B.R. 1 (D.P.R. 1991); *accord In re Caynon P'Ship*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985) (recognizing that section 363 of the Bankruptcy Code clearly indicates that the manner of the sale is within the discretion of the trustee).

23.     There is sound business justification for the Chapter 7 Trustee's decision to sell the Assets to the Buyer.  The Buyer, as the proposed purchaser of the Assets, has a more vested interest in the Assets than any other potential purchaser.  The Buyer has agreed to immediately provide the Chapter 7 Trustee a $150,000 deposit, has not requested due diligence, and has agreed to, at its own expense, satisfy certain intellectual property maintenance fees and to cover certain administrative costs necessary to maintain the Debtor's North Carolina Facility from March 1, 2015 onward (subject to reimbursement, in the event that closing with the Buyer does not occur through the no fault of the Buyer if the Sale Order is not entered through no fault of the Buyer).  In addition, given the short shelf life of some of the Debtor's clinical specimen assets, the Buyer's reasonable requirement to close the transaction on an immediate basis is further justification for the private sale.

24.     As set forth herein, the Assets were marketed pre-petition by Jefferies, a nationally recognized investment banker.  In addition, the Chapter 7 Trustee actively solicited

purchasers immediately upon his appointment.  The Chapter 7 Trustee believes in his business judgment that the negotiated terms set forth in the Private Sale Agreement, which include the estate's ability to reduce the secured claims against the estate by the amount of the Assigned Secured Claims, are superior to those he believes would be obtained from another third-party buyer.  As a result, the Chapter 7 Trustee believes that the Buyer's offer for the Assets is the highest or otherwise best offer that can be obtained under the circumstances.

25.    As a result of the Buyer's unique interest in and knowledge of the Assets, and the Buyer's willingness to provide significant consideration, the Chapter 7 Trustee believes that the Debtor's estate would benefit from the approval of the Sale of the Assets without the added costs and risks associated with a public auction for such property, at which the Chapter 7 Trustee is not guaranteed the commitment of the Buyer to purchase the Assets at all, much less at the price provided for in the Private Sale Agreement.  The Chapter 7 Trustee believes that a Sale of the Assets to the Buyer under the terms of the Private Sale Agreement will be much more likely to close in a timely manner than an auction because, in the Chapter 7 Trustee's business judgment, the Private Sale Agreement provides strong assurance that the Buyer (who is providing a significant deposit) is motivated to close the contemplated transaction in a timely manner.

26.    To summarize, in the Chapter 7 Trustee's business judgment, there is very little, if anything, to be gained by conducting a formal auction of the Assets.  Even if there were other entities willing and able to overbid the Buyer, which the Chapter 7 Trustee believes is highly unlikely given the secured creditors' willingness to credit bid their Assigned Secured Claims, the Chapter 7 Trustee believes that the delay, uncertainty and additional expenses attendant to the auction process would be unfavorable to the Debtor's bankruptcy estate and its creditors.  In addition, as set forth herein, in an abundance of caution the Chapter 7 Trustee shall provide

notice of the Sale to any party who has expressed an interest in any of the Assets and may in his

discretion advertise the Sale in a publication of his choosing, thus allowing for the possibility

that another potential bidder may present a higher and better cash offer at the Sale Hearing.  to

allow the Seller the opportunity to confirm that an alternate bidder has the requisite financial

wherewithal to close the proposed transaction, the Seller requests that the objection deadline,

which include an overbid, be scheduled two days prior to the Sale Hearing.

### C.    The Sale of the Assets Should be Approved Free and Clear of All Encumbrances

27.    Section 363(f) of the Bankruptcy Code permits a trustee to sell property free and

clear of another party's interest in the property if:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements will be sufficient to permit the sale of the Assets

free and clear of all Encumbrances that may be asserted therein.  *See Citicorp Homeowners*

*Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (sale "free and clear" may be

approved provided the requirements of at least one subsection are met); *see also In re Dundee*

*Equity Corp.,* 1992 Bankr. LEXIS 436, * 12 (Bankr. S.D.N.Y. Mar. 6, 1992) (a "sale free of the

interest concerned may occur if any one of the conditions of § 363(f) have been met").

28.     At the Sale Hearing, the Chapter 7 Trustee will demonstrate that, to the extent any valid lienholders exist, one or more of the tests of section 363(f) will be satisfied with respect to the transfer of the Assets pursuant to the Private Sale Agreement.   At the Sale Hearing, the Chapter 7 Trustee proposes that in the absence of any lienholder's objection to the relief sought in this Motion, such lienholdler shall be deemed to have consented within the meaning of section 363(f)(2) of the Bankruptcy Code.  *See Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D. N.J. 1994) (by not objecting to the sale motion, the secured creditor was deemed to consent under section 363(f)(2) of the Bankruptcy Code); *see also Pelican Homestead & Sav. A'ssn v.Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, any valid lienholders that exist will be adequately protected by having their liens (to the extent not credit bid), if any, attach to any net cash proceeds of the Assets, after costs of sale, in the same order of priority, and with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses that the Debtor and its estate may possess with respect thereto.   Accordingly, section 363(f) authorizes the transfer and conveyance of the Assets free and clear of any such claims, interests, encumbrances and liens.

29.     Accordingly, the Chapter 7 Trustee requests that the Sale of the Assets to the Buyer be free and clear of all Encumbrances, with the Encumbrances, if any, attaching to the proceeds of the Sale of such property.  The Chapter 7 Trustee further requests that the order approving the Sale provide that the Buyer shall not have any liability as successor of the Debtor, whether in law or in equity, including (without limitation) based on any theory of transferee, successor, and/or vicarious liability of any kind or nature under any law, statute, rule, or regulation.

### D.    The Buyer is a Good Faith Buyer Within the Meaning of Section 363(m) of the Bankruptcy Code

30.    Section 363(m) of the Bankruptcy Code provides that a purchaser of property of a debtor's estate is protected from the effects of reversal on appeal of authorization to the debtor to sell such property as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale order.[6]  Section 363(m) of the Bankruptcy Code "affords finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids."  *In re Chateaugay Corp.*, 1993 U.S. Dist. LEXIS 6130, *9 (S.D.N.Y. May 10, 1993) (internal quotation marks and citation omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

31.    The Bankruptcy Code does not define "good faith," but courts have adopted various definitions.  A good faith purchaser is "one who buys property . . . for value, without knowledge of adverse claims."  *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993).  The requirement that a purchaser act in good faith speaks to the integrity of the purchaser's conduct in the course of the sale proceeding.   *See In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

---

[6]  Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or subsection (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease was stayed pending appeal.

11 U.S.C. § 363(m).

32.     The terms of the Private Sale Agreement were negotiated at arms-length, without collusion or fraud, in good faith and all of the terms of the sale have been disclosed.  These negotiations have involved substantial time and energy by the parties, and the sale reflects give-and-take and compromise by both sides.  The ultimate agreement reached includes both a substantial cash contribution and credit bid of significant claims against the estate.  Accordingly, the Chapter 7 Trustee requests that the Court determine that the Buyer has acted in good faith, has bought for value and is entitled to the protections of a good faith purchaser provided by section 363(m) of the Bankruptcy Code.  *See In re United Press Int'l, Inc.*, Case No. 91-B-13955, 1992 Bankr. LEXIS 842, ** 3, 10 (Bankr. S.D.N.Y. May 18, 1992).

### E.     The Break-Up Fee and Expense Reimbursement Should be Approved

33.     The Buyer proceeded in reliance that the Chapter 7 Trustee would seek a Break-Up Fee and Expense Reimbursement and in reasonable expectation that this Court would enter an order providing such relief.  The Chapter 7 Trustee submits that the Break-Up Fee is a normal and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the bankruptcy sale process.  *See, e.g., In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that fees may "'be legitimately necessary to convince

a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking'") (internal citations omitted); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, Nos. 89 B 12171 to 89 B 12179, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that, "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987) (concluding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").

34.     Moreover, bid protections, similar to the Break-Up Fee sought to be approved by this Motion, have been approved in other bankruptcy cases in this Court. *See, e.g.*, *In re Nortel Networks Inc.*, Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); *In re Tallvgenicom, L.P.*, Case No. 09-10266 (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); *In re Carolina Fluid Handling Intermediate Holding Corp (f/k/a Fluid Routing Solutions Intermediate Holding Corp.)*, No. 09-10384 (Bankr. D. Del. Feb. 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%); *In re Archway Cookies LLC*, Case No. 08-12323 (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); *In re Wickes Holdings, LLC, et al.*, Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse agreement providing break-up fee of up to 3%);

*In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination fee); *In re Radnor Holdings*, Case No. 06-10110 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted).

35.     A proposed bidding incentive, such as the Break-Up Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate. *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (stating that the "test is whether the payment…is in the best interests of the estate); *see also In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (same); *In re Hupp Indus., Inc.*, 140 B.R. at 193-95 (same). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy Inc.),*181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

36.     In *Calpine*, the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. *Calpine*, 181 F.3d at 536. The court determined that Calpine's right to break up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. *Id*. at 537. The Trustee submits that approval of this Break-Up Fee and Expense Reimbursement will create such a competitive bidding process.

37.     First, the Break-Up Fee and Expense Reimbursement induced the Buyer to submit a bid that will serve as a minimum floor bid upon which other bidders may rely.  In addition, the Buyer's rapid entry into the Private Sale Agreement benefitted the estate by allowing the Chapter 7 Trustee to file this Motion prior to any depreciation in value to the unique specimens and intellectual property that may deteriorate in value during any period of extended inactivity. Therefore, the Buyer has provided a material benefit to the Debtor's estate and its respective creditors by encouraging bidding and increasing the likelihood that the best possible price for the Assets will be received.  *See, e.g., In re Comdisco*, *Inc.*, No. 01 B 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to the debtor's estate); *In re Kmart Corp.*, No. 02 B 02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); *Integrated Res.*, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

38.     Second, the proposed Break-Up Fee and Expense Reimbursement is the result of an arm's-length negotiated agreement between the Chapter 7 Trustee and the Buyer.  There is no evidence or reason to believe that the relationship between the Chapter 7 Trustee, the Debtor's estate and the Buyer has been tainted by self-dealing or manipulation.

39.     Third, the Chapter 7 Trustee believes that the proposed Break-Up Fee and Expense Reimbursement are fair and reasonable to compensate the Buyer for taking actions that will benefit the Debtor's estate.  The Break-Up Fee and Expense Reimbursement compensate the Buyer for diligence and professional fees incurred in negotiating the terms of the Private Sale Agreement on an expedited timeline, and the Expense Reimbursement also shall allow the Buyer to be made whole in the event it is outbid for its documented expenses in maintaining the Debtor's intellectual property portfolio and the North Carolina Facility prior to the Sale Hearing

which otherwise would likely result in an abandonment of those assets by the Chapter 7 Trustee to the detriment of the estate.

40.     Fourth, the Chapter 7 Trustee does not believe that the Break-Up Fee or Expense Reimbursement will have a chilling effect on the sale process.  Rather, the Buyer has increased the likelihood that the best possible price for the Assets will be received, by permitting other potential bidders to rely on the diligence performed by the Buyer, and moreover, by allowing potential bidders to utilize the Private Sale Agreement as a platform for presenting an offer at the Sale Hearing.

41.     Finally, the Chapter 7 Trustee will close on the transaction with the Buyer unless the Chapter 7 Trustee is able to enter into and close on a transaction with another bidder at a price sufficiently higher to cover the cost of the Break-Up Fee and Expense Reimbursement and still yield a better result for the estate.   Accordingly, no Break-Up Fee and Expense Reimbursement will be paid unless a higher and better offer is achieved and consummated.

42.     In sum, the Break-Up Fee and Expense Reimbursement are reasonable under the circumstances and will enable the Chapter 7 Trustee to maximize the value for the Assets while limiting any chilling effect in the sale process.  The Break-Up Fee and Expense Reimbursement not only compensate the estate for the risk that its assumes in foregoing a known, willing and able purchaser for a new potential acquirer, but also ensures that there is an increase in the net proceeds received by the estate, after deducting the Break-Up Fee and Expense Reimbursement to be paid to the Buyer in the event of a prevailing overbid.

**F.     Authorization of Assumption and Assignment of Assumed Contracts**

43.     As set forth in the procedures proposed above, the proposed sale contemplates the assumption and assignment of certain executory contracts and unexpired leases to the Buyer

which will enhance the value of the proposed sale to the Debtor's estate by curtailing further administrative liability to the estate and eliminating substantial rejection claims. Accordingly, the Chapter 7 Trustee requests approval under section 365 of the Bankruptcy Code, and as part of the proposed sale, of the assumption and assignment of the Assumed Contracts to the Buyer, notwithstanding any provisions in the Assumed Contracts, including those described in sections 365(b)(2) and (f)(l) and (3) of the Bankruptcy Code, that purport to prohibit such assignment.

    44.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

45.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a trustee's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and assignment of the Assumed Contracts will be a necessary part of the deal that the Chapter 7 Trustee has struck with the Buyer and, as stated above, will benefit the estate.

46.     Upon notice of which executory contracts the Buyer wishes to be assigned at least fifteen (15) days prior to the Sale Hearing, the Chapter 7 Trustee will immediately send the Cure Notice to all counterparties to the Potential Assumed Contracts notifying such counterparties of the potential assumption by the Chapter 7 Trustee and assignment to the prevailing bidder of such contracts and leases.  The Cure Notices will set forth the "cure" amounts owing on each of the Potential Assumed Contracts, according to Debtor's books and records.

47.     Counterparties to the Potential Assumed Contracts will be given time to file an objection to the proposed Cure Amounts set forth in the Cure Notice and, in the event that they object, to then present such objection at the Sale Hearing.  To the extent no objection is filed with regard to a particular Cure Amount by the objection deadline, such Cure Amount shall be binding on the Chapter 7 Trustee and the applicable counterparty.  The payment of the Cure Amounts specified in the Cure Notice (or a different amount either agreed to by the Chapter 7 Trustee or resolved by the Court as a result of a timely-filed objection filed by a counterparty)

will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Chapter 7 Trustee determines, prior to the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to be transferred to the Buyer.  Moreover, the Buyer in its sole discretion may require the Chapter 7 Trustee to remove any Assumed Contract from the Assumed Contract Schedule at any time up to the Closing of the Sale.  The Counterparty to any deleted Assumed Contract will be notified of such deletion by written notice via U.S. first-class mail by no later than two (2) business days from such determination.

48.    The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). *See also, In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, evidence of the Buyer's ability to provide adequate assurances to counterparties to the Assumed Contracts will be presented at the Sale Hearing.  Moreover, any overbid that is selected as the highest and best bid will be required to contain evidence that the bidder can provide adequate assurance of future performance with respect to the Assumed Contracts at the Sale Haring.

49.    The Chapter 7 Trustee proposes to cure existing defaults, and provide adequate assurance of future performance, under the Assumed Contracts by requiring that the Buyer pay

all Cure Amounts in the context of the Private Sale Agreement.  The Buyer shall be authorized to

negotiate directly with these counterparties to executory contracts and unexpired leases that it

wishes to have assumed or assigned.  Accordingly, assumption and assignment of the Assumed

Contracts as part of the Sale of the Assets at or subsequent to the Closing of the proposed sale is

appropriate under the circumstances.

### V.    Relief Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate

50.    Bankruptcy Rule 6004(h) provides that an order authorizing "the use, sale, or

lease of property … is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d)

provides that "an order authorizing the trustee to assign an executory contract or unexpired lease

under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6006(d).  The Trustee requests that any order approving the

Purchase Agreement be effective immediately by providing that the fourteen (14) day stays

under Bankruptcy Rules 6004(h) and 6006(d) are waived.

51.    The purpose of each of Bankruptcy Rules 6004(h) and 6006(d) is to provide

sufficient time for an objecting party to obtain a stay before an order can be implemented.  *See*

Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy

Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order

otherwise" and eliminate or reduce the fourteen (14) day stay period, *Collier* suggests that the

fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close

immediately "where there has been no objection to the procedure."  10 Lawrence P. King,

*Collier on Bankruptcy*, 6004.10 (16th ed. 2010).  *Collier* further provides that if an objection is

filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may

be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party. *Id.*

52.     To maximize the value received for the Assets, and to comply with the Buyer's demand to close on the Sale by no later than February 27, 2015, the Chapter 7 Trustee seeks to close the proposed sale as soon as possible after the Sale Hearing, subject to the terms of the Private Sale Agreement. Accordingly, the Chapter 7 Trustee hereby requests that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the lesser alternative, if an objection to the sale is filed and overruled by the Court, reduce the stay period to the minimum amount of time needed by the objecting party to seek a stay pending appeal.

53.     In light of the continuing costs associated with maintenance and immediate attention necessary with respect to the Assets such as the clinical specimens, the parties request that the Court waive Bankruptcy Rules 6004(h) and 6006(d) to enable the Chapter 7 Trustee to promptly sell the Assets and close the sale at the earliest opportunity.

## VI.   Notice

54.     This Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Buyer; (iii) all parties who have entered a notice of appearance in the Debtor's case pursuant to Bankruptcy Rule 2002, and (iv) all applicable federal, state and local regulatory or taxing authorities or recording offices which are known by the Chapter Trustee to have an interest in the relief requested in the Motion.

55.     Notice of this Motion has been provided to anyone who previously expressed an interest in the Assets and all known creditors including lienholders advising them that a complete copy of the Motion with the attached Private Sale Agreement can be obtained upon written

request to counsel for the Chapter 7 Trustee.  In light of the nature of the relief requested herein, the Chapter 7 Trustee submits that no other or further notice is required.

## VII.   Conclusion

**WHEREFORE**, for the foregoing reasons, the Chapter 7 Trustee respectfully requests that the Bankruptcy Court enter (i) an order (a) approving the terms of the Private Sale Agreement by and between the Chapter 7 Trustee and the Buyer, (b) approving the Break-Up Fee and Expense Reimbursement relating to the Sale of substantially all of the Assets, (c) approving the cure procedures and the form and manner of notice thereof, and (d) scheduling a sale hearing to be held no later than February 24, 2014; and (ii) an order (a) approving the sale of the Assets to the Buyer, and (b) granting related relief.

Dated: February 12, 2015
      Wilmington, Delaware

**McCARTER & ENGLISH, LLP**

By: */s/ Katharine L. Mayer*
Katharine L. Mayer (DE # 3758)
405 N. King Street, 8th Floor
Wilmington, DE 19801
Telephone: (302) 984-6300
kmayer@mccarter.com


*- and -*

Charles A. Stanziale, Jr.
Jeffrey T. Testa
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
jtesta@mccarter.com
sbernstein@mccarter.com

*Attorneys for the Chapter 7 Trustee*